**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

STATE OF WASHINGTON,

                    Respondent,

        v.

PETER ALEXANDER NORTON,

                    Appellant.

DIVISION ONE

No. 81365-0-I

UNPUBLISHED OPINION

DWYER, J. — Peter Norton appeals from his convictions for assault in the second degree and vehicular assault. He contends that the trial court violated his right to present a defense by excluding evidence that supported his defense theory. Norton also asserts that, should we affirm his convictions, we must nevertheless remand to superior court to strike an improperly imposed criminal filing fee and to determine whether the imposition of a DNA collection fee is proper. We affirm the convictions, but remand to the superior court to strike the criminal filing fee and to determine whether Norton must pay a DNA collection fee.

I

On September 22, 2017, Norton struck pedestrian Edward Horner with his motor vehicle. The collision was witnessed by several people, including Tiffany Jenks. Norton, Horner, and Jenks all knew each other prior to the collision.

Citations and pin cites are based on the Westlaw online version of the cited material.

The State subsequently charged Norton with one count of assault in the second degree and one count of vehicular assault. At trial, Norton did not dispute that he had struck Horner with his motor vehicle. Rather, he disputed whether he had possessed the required mental states to be convicted of the charged offenses.[1]

Norton testified that he had been driving on the opposite side of the road from Horner when he saw Horner "flipping [him] off". Norton further testified that this caused him to be concerned that Horner was going to get himself into trouble, because he was Horner's neighbor and had previously seen Horner get himself into trouble when engaging in similar behavior. Norton then testified that he decided to "spin around, pick [Horner] up and take him home so he wasn't getting in anymore trouble." According to Norton, when he turned his motor vehicle around and started to pull off the road near Horner, Horner threw a beer can at his windshield and charged the vehicle.

---

[1] For the crime of assault in the second degree, the jury was instructed that, to convict, it must find that Norton had committed "an act done with intent to inflict bodily injury upon another, intending but failing to accomplish it, and accompanied with the apparent present ability to inflict the bodily injury if not prevented." The jury was also instructed that "[a] person acts with intent or intentionally when acting with the objective or purpose to accomplish a result that constitutes a crime."

For the crime of vehicular assault, the jury was instructed that, to convict, it must find that Norton must have driven his vehicle in such a manner as to have caused substantial bodily harm to Horner and either "A, drove the vehicle in a reckless manner, or B, drove the vehicle with a disregard for the safety of others."

The jury was also provided with an instruction defining various mental states:

To operate a motor vehicle in a reckless manner means to drive in a rash or headless manner, indifferent to the consequences. Disregard for the safety of others means an aggravated kind of negligence or carelessness falling short of recklessness but constituting a more serious dereliction than ordinary negligence.

Ordinary negligence is the failure to exercise ordinary care. Ordinary negligence is the doing of some act which a reasonably careful person would not do under the same or similar circumstances, or the failure to do something which a reasonably careful person would have done under the same or similar circumstances.

In contrast to Norton, Horner testified that while he did indeed throw a beer can at the windshield of Norton's vehicle and had flipped him off, he did so only after Norton ran a stop sign, turned the motor vehicle to face him, and "gunned it."

Several other witnesses testified to the events leading up to and following the collision, but only one, Jenks, corroborated Norton's testimony that Horner ran toward the motor vehicle. Jenks testified that she observed, prior to the collision, Horner "yelling very loudly with nobody else around him," "flailing his arms about," and "walking erratically." She further testified that Norton's motor vehicle made a U-turn right in front of her and slowly began driving toward Horner and pulling off of the road. As the motor vehicle pulled in towards Horner, Jenks testified that she observed the vehicle slow down but still collide with Horner because Horner threw a beer can at the windshield and ran toward the vehicle.

Following the presentation of evidence, Norton's counsel gave closing argument to the jury during which she asserted that the State had failed to establish that Norton possessed the mental states required to convict him of assault in the second degree and vehicular assault. She further argued that Norton had intended to help Horner when he turned his vehicle around and drove toward him, and that the collision occurred because Horner ran toward the vehicle.

After hearing closing arguments, the jury found Norton guilty of assault in the second degree and vehicular assault.

At Norton's subsequent sentencing hearing, the sentencing judge found that Norton was unable to pay discretionary costs, then imposed a standard range sentence and required Norton to pay a $200 criminal filing fee, a $100 DNA collection fee, and any interest that accrued on all fees owed as part of the sentence until paid. Norton appealed to Division Two, which transferred the matter to us for resolution.

II

Norton appears to primarily contend that the trial court erred by barring him and Jenks from testifying to facts that supported his defense theory that he lacked the required mental states to be found guilty of the crimes with which he was charged and that this violated his constitutional "right to present a defense."[2] Based on the argument provided therein, Norton's briefing appears to assert that (1) evidentiary rulings during Jenks' testimony excluded evidence of her observations of Horner's past troublesome behavior, (2) evidentiary rulings during Norton's testimony prevented him from testifying to his mental state and his prior experiences with Horner, and (3) collectively, these exclusions violated his "right to present a defense" by preventing him from arguing his theory to the jury that he lacked the mental states required to be convicted of the crimes of assault in the second degree and vehicular assault.[3] We reject these assertions.

---

[2] It is somewhat unclear exactly which evidentiary rulings Norton is asserting violated his rights. His briefing contains no assignments of error to specific evidentiary rulings but, rather, asserts that his rights were violated by the exclusion of "testimony that Norton believed the alleged victim was in trouble based on his past experiences with him and that another witness, who had seen the alleged victim just prior to the incident and noticed his erratic behavior, had similar experiences." Br. of Appellant at 1.

[3] Norton also asserts that the prosecutor committed misconduct during closing argument and that such misconduct requires reversal. "To prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in

The record establishes that the trial court never denied a request by defense counsel to present testimony from Jenks regarding her observations of Horner's behavior in the past, that Norton testified to the facts necessary to present his defense, and that Norton did, in fact, argue his defense theory to the jury.

The Sixth Amendment to the United States Constitution and article 1, section 22 of the Washington Constitution guarantee a defendant's rights to compulsory process and to confront the witnesses against him or her. U.S. CONST. Amend. VI; CONST. art. I, § 22. "Courts and litigants often refer to these rights, collectively, as the 'right to present a defense,' although this phrase does not appear in our state or federal constitutions." State v. Bedada, No. 79036-6-I, slip op. at 6 n.2 (Wash. Ct. App. May 11, 2020), https://www.courts.wa.gov/opinions/pdf/790366.pdf (citing State v. Arndt, 194 Wn.2d 784, 789, 453 P.3d 696 (2019)).

Our Supreme Court has explained that contentions that evidentiary rulings violated a defendant's constitutional "right to present a defense" are reviewed pursuant to a two-step process. Arndt, 194 Wn.2d at 797-98. First, we review the challenged evidentiary rulings under an abuse of discretion standard. Then, if necessary, we review de novo whether such rulings violate a defendant's constitutional "right to present a defense." See Arndt, 194 Wn.2d at 797-812

---

the context of the entire record and the circumstances at trial." State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). In his briefing on this issue, Norton does not assert that any of the alleged misconduct was prejudicial, nor does he set forth any argument analyzing how any of the alleged misconduct prejudiced him. Because there is no possibility of reversal absent a showing of prejudice to Norton, we need not further address this insufficiently briefed contention. See State v. Mason, 170 Wn. App. 375, 380, 285 P.3d 154 (2012) (declining to consider insufficiently briefed contention).

(first determining that evidentiary rulings did not constitute abuse of discretion and then, only after finding no abuse of discretion, considering de novo whether the rulings violated the right to present a defense).

Here, Norton does not contend that any of the trial court's rulings violated applicable rules of evidence. Hence, we proceed directly to considering whether they violated his "right to present a defense." We consider whether a trial court's otherwise valid evidentiary rulings deprived a defendant of the "right to present a defense" de novo. Arndt, 194 Wn.2d at 797.

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). "A defendant's right to an opportunity to be heard in his defense, including the rights to examine witnesses against him and to offer testimony, is basic in our system of jurisprudence." State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (citing Chambers, 410 U.S. at 294). However, "[d]efendants have a right to present only relevant evidence, with no constitutional right to present *irrelevant* evidence." Jones, 168 Wn.2d at 720.

When determining whether the "right to present a defense" has been violated, "the State's interest in excluding evidence must be balanced against the defendant's need for the information sought to be admitted." Arndt, 194 Wn.2d at 812. It would violate a defendant's right to present a defense to bar the admission of evidence that, "if excluded, would deprive defendants of the ability to testify to their versions of the incident." Jones, 168 Wn.2d at 721. However, a

6

trial court may bar the admission of evidence that, if excluded, would not completely bar a defendant from offering relevant evidence that would enable the defendant to present the defense theory of the case to the jury. See Arndt, 194 Wn.2d at 814 (concluding that Arndt's right to present a defense was not violated in a murder and arson case when only some of her proffered evidence was excluded and she was able to argue her defense theory).

A

We first address Norton's contention that the trial court excluded Jenks' proposed testimony regarding her observations of Horner's past behavior.[4] Norton appears to assert that the trial court made rulings barring the admission of Jenks' prior observations of Horner during a discussion on the record regarding the State's motions in limine and during Jenks' testimony at trial. To the contrary, the record establishes that Norton's trial counsel never sought to admit such testimony and, thus, did not properly preserve this claim of error for appeal.

---

[4] The State incorrectly contends that such testimony is not relevant to Norton's state of mind. Evidence is relevant when it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Jenks' testimony regarding Horner's past troublesome behavior would have supported Norton's argument that he had driven towards Horner with the intent to help him avoid engaging in further troublesome behavior.

The State further contends that this would support Norton's defense theory only if it was proved that Jenks and Norton witnessed the exact same prior troublesome behavior. We do not agree. If Jenks witnessed Horner engage in prior troublesome behavior, it makes Norton's contention that he previously observed Horner engage in troublesome behavior more probable, and thus makes his theory that he was worried that Horner was going to get into more trouble and that he intended to assist Horner more credible.

The State also avers, without citation to supporting authority, that even if the evidence is relevant to establishing Norton's state of mind, it would be impermissibly speculative for the jury to connect evidence of Horner's prior acts to Norton's state of mind on the day of the collision. We reject this unsupported contention. See State v. Logan, 102 Wn. App. 907, 911, 10 P.3d 504 (2000) (declining to consider the State's argument for an extension of the speedy trial deadline where unsupported by citation to authority). Plainly, such circumstantial evidence, supporting an inference as to Norton's mental state, is not impermissibly speculative.

We generally review "only issues which the record shows have been argued and decided at the trial court level." State v. Aguirre, 73 Wn. App. 682, 687, 871 P.2d 616 (1994) (citing State v. Davis, 41 Wn.2d 535, 250 P.2d 548 (1952); Metcalf v. Metcalf, 57 Wn.2d 612, 358 P.2d 983 (1961); Buchsieb/Danard, Inc. v. Skagit County, 99 Wn.2d 577, 663 P.2d 487 (1983)). We will consider contentions that the trial court erroneously excluded evidence only when the party seeking review made an adequate offer of proof before the trial court, unless the substance of the excluded evidence is apparent from the record. State v. Ray, 116 Wn.2d 531, 538-39, 806 P.2d 1220 (1991). An adequate offer of proof (1) informs the trial court of the legal theory under which the offered evidence is admissible, (2) informs the trial court of the specific nature of the evidence offered to enable the court to judge its admissibility, and (3) creates an adequate record for appellate review. Ray, 116 Wn.2d at 538 (citing Mad River Orchard Co. v. Krack Corp., 89 Wn.2d 535, 537, 573 P.2d 796 (1978); State v. Negrin, 37 Wn. App. 516, 525, 681 P.2d 1287 (1984)).

Herein, the record establishes that Norton never requested to admit any testimony from Jenks regarding her prior observations of Horner's behavior. Thus, he has not preserved the issue of whether such testimony was admissible. During an on the record discussion before trial regarding the State's motions in limine, defense counsel explained that she expected to elicit the following testimony from Jenks:

> Ms. Jenks was walking down the street and saw this, she saw Mr. Horner, who she also knows from living at Maloney Heights or being in the homeless community, saw him screaming,

8

yelling, flailing his arms, saw him throw the beer can at the car and knew that he was trouble, that Mr. Horner was in trouble.
And then she saw him run at the car and jump on -- what appeared to be jump on the car . . . . [t]hat's the testimony.

Norton's counsel then further explained that Jenks' testimony "goes to my client's state of mind. . . . [I]t's offered to prove why my client did what he did, why he turned the car around."

After hearing this explanation, the court ruled that Jenks could testify as to her observations, such as if she saw "Mr. Horner on the side of the road throwing beer cans, flailing his arms, dancing, whatever he happened to be doing that [she] could observe." The court further explained that Jenks was not permitted "to testify as to why he was doing those things, whether it was because he was off his meds, [or] because he was having a psychotic episode." Thus, although the court ruled that testimony explaining the *reasons* for Norton's behavior was impermissible, it did not make any ruling regarding the admissibility of Jenks' prior *observations* of Horner's behavior.

Then, during Jenks' testimony at trial, defense counsel attempted to elicit testimony from Jenks regarding her observations of Horner on the day of the collision. The prosecutor objected, arguing that the information was not relevant and, in the alternative, that Jenks should not be permitted to testify because she was incapable of testifying to her observations of Horner without also explaining why he behaved in the way that she observed. Norton's counsel then offered the following explanation for her question:

I'm trying to direct the witness to answer the question what did you see, okay. And I think I expect her to say that she saw Ed flailing his arms, talking to himself. Uh, that he wasn't just walking quietly

9

on the road. That's the testimony I'm attempting to elicit from this witness. I'm not attempting to have her say that she knows him, that he's crazy, or that she knows him, that he's dangerous.

Immediately following this exchange, the court restricted Jenks' testimony to what she "saw on the 22nd of September," noting that she could not put her observations in context by testifying to her previous experiences with Horner. Norton's counsel did not protest that this ruling was improper. Furthermore, she never attempted to elicit any testimony from Jenks regarding any observations of Horner's behavior prior to the day of the collision. Nor was any offer of proof ever made to establish that which Jenks would testify to were she permitted to testify to her past observations of Horner's behavior. Norton's trial counsel never argued that such testimony was admissible.

Because Norton never sought to elicit any testimony from Jenks regarding her prior observations of Horner's behavior and never presented any argument or offer of proof pertaining to the admissibility of any such testimony, Norton has failed to preserve the claim of error that such testimony was improperly excluded.

B

Next we consider Norton's contention that the court's rulings barred him from personally testifying to his mental state and to his prior observations of Horner's behavior. Again, the record does not support Norton's contention.

At trial, Norton testified that he drove towards Horner intending to help him avoid "getting in anymore trouble," that he did so because of his past experiences observing Horner's behavior, and that the collision occurred

10

because Horner ran directly into his vehicle. Thus, plainly, Norton was permitted to testify to his version of events.

C

While it is apparent that the trial court cannot have violated Norton's "right to present a defense" by excluding evidence Norton never sought to admit—Jenks' prior observations of Horner's behavior—or by allowing Norton to testify—specifically to his mental state and to his prior observations of Horner's behavior—we nevertheless next analyze whether the trial court violated Norton's right to present a defense.

The record establishes that Norton was permitted to argue, and did in fact argue, his theory to the jury that he intended to help Horner when Horner ran at his vehicle. Because Norton presented sufficient evidence to argue his defense theory to the jury, and did in fact argue his theory to the jury, his "right to present a defense" was not violated. See Arndt, 194 Wn.2d at 813-14 (concluding that there was no violation of Arndt's right to present a defense because Arndt was able to advance her defense theory through the presentation of some, though not all, of her proffered supporting evidence).

III

Finally, Norton contends that we should remand this matter to the superior court with directions to strike from his sentence the imposition of a $200 criminal filing and the interest provision because he is indigent. He further urges that the superior court be directed to determine whether a $100 DNA collection fee should have been imposed given that he was previously convicted of a felony

11

and may have had his DNA previously collected by the State. The State concedes that such a remand is required. We agree. We, therefore, affirm Norton's convictions, but remand this matter to the superior court with directions to determine whether the State has previously collected a DNA sample from Norton, to strike from Norton's sentence the DNA collection fee unless the State demonstrates that Norton's DNA was not previously collected,[5] and to strike from Norton's sentence the criminal filing fee and interest provision.

Affirmed in part, reversed in part, and remanded.

Duy, J.

WE CONCUR:

Chun, J.          Smith, J.

---

[5] See State v. Houck, 9 Wn. App. 2d 636, 651 n.4, 446 P.3d 646 (2019), review denied, 194 Wn.2d 1024 (2020) ("[T]he State must show that the defendant's DNA has not previously been collected.").